IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ALTON TIMOTHY INGRAM,        )
    Plaintiff,                   )
                                 )
    v.                           )        Civil No. 3:14cv491 (JRS)
                                 )
CAROLYN W. COLVIN            )
Acting Commissioner of Social Security,   )
    Defendant.                   )
_____ )

## REPORT AND RECOMMENDATION

Alton Timothy Ingram ("Plaintiff") is forty-five years old and previously worked as a security guard. On January 19, 2011, Plaintiff applied for Social Security Disability Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from herniated discs, lower back pain and sciatic nerve damage with an alleged onset date of August 26, 2007. Plaintiff's claims were denied both initially and upon reconsideration. On April 19, 2012, Plaintiff (assisted by a non-attorney representative) appeared before an Administrative Law Judge ("ALJ") for an administrative hearing. On January 8, 2013, Plaintiff (assisted by a non-attorney representative) appeared before an ALJ for a supplemental hearing, during which Plaintiff amended his alleged onset date to June 26, 2009. The ALJ subsequently denied Plaintiff's claims in a written decision dated January 16, 2013. On May 27, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in assessing the opinions of Dr. Grady and Dr. Januzzi, in assessing Plaintiff's

credibility, in determining that Plaintiff could return to his past employment and in determining that Plaintiff could perform work available in the national economy. (Pl.'s Mem. in of [sic] P. & A. in Supp. of Pl.'s Mot. for Summ. J. (ECF No. 14) at 17-23.) The parties have submitted cross-motions for summary judgment, which are now ripe for review. Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED, that Plaintiff's Motion for Remand (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.     BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, medical history, function report, testimony and Vocational Expert ("VE") testimony are summarized below.

### A. Education and Work History

Plaintiff was 41 years old when he applied for DIB and SSI. (R. at 189.) Plaintiff completed school through the tenth grade and obtained a G.E.D. (R. at 35.) Plaintiff previously worked as a security guard and built fireplaces. (R. at 36-38.) After the alleged onset of Plaintiff's disability, Plaintiff worked briefly at a recycling center. (R. at 36.)

### B.  Medical Records

#### 1.   University Medical Center

On October 8, 2007, Plaintiff saw Mary Gauthier, F.N.P. of the University Medical Center in Las Vegas, Nevada, complaining of acute lower back pain. (R. at 369.) Nurse

2

Gauthier diagnosed Plaintiff with chronic sciatica that caused intermittent lower back pain and radiation in Plaintiff's right leg. (R. at 369.) Nurse Gauthier prescribed Lortab, Diclofenac and Flexeril, but Plaintiff stopped taking the medications, because he did not like the way that they made him feel. (R. at 369.) Plaintiff denied using tobacco, stated that he drank one to two beers a week and smoked marijuana every other day. (R. at 369.) Nurse Gauthier found that Plaintiff's back was normal and a previous spasm to the right of Plaintiff's spine was no longer present. (R. at 369.)

On November 20, 2007, Plaintiff saw Jennifer Avena, D.O. at the University Medical Center. (R. at 371.) Plaintiff reported that his lower back pain had resolved and that he had no lower back pain. (R. at 371.) Plaintiff had returned to employment and was working twenty hours a week at a sandwich shop. (R. at 371.) Plaintiff stated that he had flares of lower back pain twice a year. (R. at 371.) Dr. Avena recorded that Plaintiff maintained a normal gait and easily moved from his chair to the examination table. (R. at 371.)

On November 30, 2007, Plaintiff underwent a CT scan that revealed a moderate broad-based disk bulge at L5-S1 with moderate right neural foraminal narrowing and mild left neural foraminal narrowing. (R. at 375.) Based on the CT scan, Dr. Avena also diagnosed Plaintiff with a moderate broad-based disc bulge with moderate bilateral neural foraminal narrowing at L4-L5. (R. at 375.) Dr. Aveno diagnosed Plaintiff's pain as being neuropathic and gave Plaintiff a prescription for Lyrica. (R. at 375.)

On January 10, 2008, Plaintiff saw Amy Urban, M.D. in the University Medical Center's emergency room, complaining of cramps. (R. at 335.) Plaintiff reported increased right leg pain, but no tingling or numbness. (R. at 335). Dr. Urban observed that Plaintiff had no disturbance in his gait and that Plaintiff moved back and forth from the bed. (R. at 335.) Dr. Urban

3

prescribed one Percocet, which Plaintiff stated had helped. (R. at 335.) Dr. Urban prescribed Lortab, Flexeril and ibuprofen, told Plaintiff to apply heat to his back and advised Plaintiff to follow-up with his primary care provider. (R. at 336.)

On February 20, 2008, Plaintiff saw Dr. Avena for a three-month check-up. (R. at 375.) Plaintiff continued to have pain in his legs, especially at night. (R. at 375.) Plaintiff described the pain as aching and cramping, and further stated that the pain was present when he first woke up, but that the pain resolved as Plaintiff "got going." (R. at 375.) Dr. Avena described Plaintiff as ambulatory and noted that Plaintiff experienced no difficulty getting on the examination table. (R. at 375.)

On February 6, 2009, Plaintiff returned to Dr. Avena, complaining of cramping in his lower legs in the evening and some lower back soreness and stiffness in the mornings. (R. at 349.) Dr. Avena opined that Plaintiff maintained normal gait and station, and that Plaintiff was not in acute distress. (R. at 349.) Dr. Avena prescribed ibuprofen, baclofen and Neurontin for Plaintiff's lower back pain. (R. at 349.) Dr. Avena also referred Plaintiff to physical therapy and pain management for further evaluation and treatment. (R. at 349.)

On April 1, 2009, Plaintiff saw John D. McCourt, M.D. in the emergency room of University Medical Center, complaining of pain in his back and neck with tingling in his fingers. (R. at 329.) Plaintiff reported that his pain was so severe that he could not wait for his follow-up with Dr. Avena, and Plaintiff required an ambulance to take him to the emergency room. (R. at 329.) Plaintiff also rated his pain a ten on a scale of one-to-ten. (R. at 329.) Dr. McCourt noted that Plaintiff appeared healthy, alert, oriented and in no acute distress. (R. at 329.) Dr. McCourt further observed that Plaintiff walked in and out without difficulty, and that Plaintiff locked an antalgic gait. (R. at 329.) Plaintiff maintained equal leg strength bilaterally. (R. at 330.)

4

Dr. McCourt had an x-ray taken of Plaintiff's spine that revealed that Plaintiff had normal C-spine and L-spine. (R. at 330.) While in the emergency room, Plaintiff took Toradol and Percocet, which helped to reduce pain. (R. at 330.) Dr. McCourt diagnosed Plaintiff with acute exacerbation of his chronic back pain. (R. at 330.) Dr. McCourt prescribed Lortab for pain, but cautioned Plaintiff to use it sparingly. (R. at 330.)

On April 10, 2009, Plaintiff saw Lori Winchell, F.N.P., complaining of severe back pain radiating down his right leg. (R. at 341.) Plaintiff stated that he was taking ibuprofen 800 and baclofen, that he only took Lortab once and that his pain had not improved. (R. at 341.) Plaintiff did not take his medication for two to three weeks before the onset of his symptoms. (R. at 342.) Plaintiff had not gone for pain management or physical therapy sessions. (R. at 341.) Plaintiff complained of increased fatigue, because his pain kept him awake, and indicated that his pain medication caused him severe constipation. (R. at 341.)

Nurse Winchell reported that Plaintiff had good range of motion in his upper extremities, as well as his head and neck, but that Plaintiff had limited range of motion in his right and left legs. (R. at 341.) Plaintiff could complete external rotation testing without significant pain, but straight leg testing caused pain in Plaintiff's legs bilaterally. (R. at 341.) Plaintiff complained that the pain in his right leg radiated from his gluteus down to his foot. (R. at 341-42.) Nurse Winchell reported that there was no atrophying or tremors in Plaintiff's lower extremities. (R. at 342.)

Nurse Winchell reported that Plaintiff was oriented to person, place and time, that Plaintiff responded to verbal and nonverbal cues appropriately and that Plaintiff was cooperative throughout the examination. (R. at 342.) Plaintiff had normal reflexes. (R. at 342.) Nurse Winchell prescribed Medrol, Dosepak and Robaxin in place of cyclobenzaprine. (R. at 342.)

5

On May 12, 2009, Plaintiff saw Almaz Araya, P.T. at the University Medical Center for physical therapy. (R. at 382.) Plaintiff complained of continuous back pain. (R. at 382.) Plaintiff stated that walking for more than an hour made his right leg cramp and that sitting for more than five minutes increased the pain in his back. (R. at 382.) Plaintiff rated his pain as being seven out of ten. (R. at 382.)

Plaintiff's hip flexion, knee flexion, knee extension and dorsiflexion were all 5/5 bilaterally. (R. at 382.) Plaintiff had decreased light-touch sensation in his right S2, and Plaintiff's reflexes decreased bilaterally in his S1. (R. at 382.) Plaintiff complained of moderate tenderness in his lumbar erector spinae. (R. at 382.) During Plaintiff's right straight leg raise test, Plaintiff complained of back pain around his fifty-degree hip flexion, and around seventy-degrees during his left leg test. (R. at 383.) IL, ST and SS ligament provocation also caused Plaintiff back pain. (R. at 383.) Plaintiff's Fabers test was positive bilaterally. (R. at 383.)

On May 27, 2009, Plaintiff returned to Dr. Avena for a new physical therapy referral. (R. at 384.) Dr. Avena reviewed x-rays taken after Plaintiff's previous appointment and noted no significant degenerative changes. (R. at 384.) Dr. Avena noted that Plaintiff was not in acute distress, was cooperative and pleasant, and ambulated without assistance. (R. at 384.) Dr. Avena assessed Plaintiff's lower back pain as being secondary to spinal stenosis. (R. at 384.)

2.  CoxHealth North

On September 9, 2009, Plaintiff saw Dr. Cooper of the CoxHealth Emergency Services/Urgent Care Department in Springfield, Missouri, complaining of lower back pain. (R. at 410.) Plaintiff cited herniated discs as part of his medical history. (R. at 410.) Plaintiff's chart indicated that Plaintiff's pain was dull and that remaining still relieved Plaintiff's pain. (R. at 413.) Dr. Cooper prescribed Prednisone, methocarbamol and Vicodin as needed. (R. at 408.)

6

On June 25, 2010, Plaintiff saw James Schmitt, M.D. at the CoxHealth North Emergency Department. (R. at 404.) Plaintiff presented with facial swelling and a deformity to his right pinky finger that resulted from attempting to break up a fight. (R. at 404.) Plaintiff complained that movement aggravated his symptoms, that his symptoms were moderate at their worst, and that he had experienced no similar symptoms in the past. (R. at 404.) Dr. Schmitt's medical history noted that Plaintiff suffered from a herniated disc. (R. at 404.) Upon examination, Plaintiff's neck and back were negative for injury and pain. (R. at 404-05.) Plaintiff's musculoskeletal and extremity examination returned a positive result only for the finger deformity. (R. at 404-05.)

On July 8, 2010, Plaintiff saw Patrick Gilbreth, M.D. in the CoxHealth North Emergency Department, complaining of lower back and leg pain. (R. at 400.) Plaintiff told Dr. Gilbreth that the pain began over four years earlier and that the pain radiated down Plaintiff's right leg. (R. at 400.) Dr. Gilbreth noted that Plaintiff moved about easily, that Plaintiff moved all four limbs, that Plaintiff's strength was 5/5 in all extremities and that Plaintiff's gait was steady and deep. (R. at 400.) Plaintiff's back examination was negative for injury and pain. (R. at 400.) Plaintiff's musculoskeletal and extremities exam was negative for injury or deformity. (R. at 400.) Dr. Gilbreth listed Plaintiff's condition as stable and prescribed Flexeril, Percocet and Medrol. (R. at 401.)

### 3. Kitchen Clinic

In July and August 2010, Plaintiff reported to the Kitchen Clinic in Springfield, Missouri. (R. at 485.) Plaintiff complained of back pain and difficulty sitting for prolonged periods of time. (R. at 485.) Plaintiff appeared uncomfortable on the exam table and changed positions,

but was able to toe and heel walk. (R. at 485.) Plaintiff further exhibited tenderness in his spine and hips. (R. at 485.)

On September 16, 2010, Plaintiff again went to the Kitchen Clinic, complaining of back pain. (R. at 484.) Plaintiff claimed that none of the medications prescribed to him helped his back pain and that he was not taking any medications. (R. at 484.) Plaintiff had no interest in surgery. (R. at 484.) The examining physician prescribed Gabapentin and referred Plaintiff for physical therapy. (R. at 484.)

On February 15, 2011, Plaintiff went to the Kitchen Clinic for his back pain. (R. at 482.) Plaintiff had his leg up on a chair, complained on multiple occasions of pain and used the arms of the chair to get out of the chair. (R. at 482.) On February 24, 2011, Plaintiff was referred again for physical therapy. (R. at 482.)

### 4. Ozarks Community Hospital

On February 23. 2011, Plaintiff saw Dorinda Faulkner, M.D. at Ozarks Community Hospital in Springfield, Missouri, complaining of an extremely sharp pinching pain at all times. (R. at 416.) Plaintiff stated that he experienced no relief from the pain and that using a heating pad worsened his symptoms. (R. at 416.) Plaintiff claimed that the pain radiated down his posterior right leg and foot. (R. at 416.) Plaintiff stated that his right leg buckled every other day and that he had nearly fallen. (R. at 416.) Putting a coat or pillow behind his back improved his symptoms, but his back and leg pain were so severe that he could not lift his forty-pound daughter or stand or sit for any amount of time. (R. at 416.)

Plaintiff stated that he could walk four blocks before having severe right leg pain. (R. at 417.) Plaintiff could stand for forty-five minutes before suffering back pain and sit for two hours before his back began hurting. (R. at 417.) Plaintiff stated that, on a normal day, he woke up

around 5:45 a.m. with severe right leg cramps. (R. at 417.) Plaintiff took from forty-five

minutes to an hour to get out of bed, depending on his level of back pain. (R. at 417.) Plaintiff

reported that he would then get dressed and "inch [his] way out of the house" to go to a clinic

and then to the library to work on Social Security paperwork. (R. at 417.) Plaintiff stated that he

returned home, because his body hurt. (R. at 417.)

Upon examination, Dr. Faulkner noted that Plaintiff was cooperative, alert and oriented.

(R. at 417.) Plaintiff appeared uncomfortable while sitting, moved very slowly and, eventually,

laid still on his left side. (R. at 417.) Dr. Faulkner observed, however, that Plaintiff sat and

moved comfortably in the waiting room before his appointment. (R. at 417.) During his

evaluation, Plaintiff propped himself up on his elbows while lying on his stomach to work on

crossword puzzles. (R. at 417.)

Plaintiff initially stated that his pain came from a small right paraspinal area. (R. at 418.)

However, upon palpitation, Plaintiff changed the location of his pain to include his entire

bilateral lumbar muscles. (R. at 418.) Plaintiff then included his lumbar spine to areas

experiencing pain. (R. at 418.) Dr. Faulkner opined that Plaintiff was overly dramatic and

writhed in pain when palpitated. (R. at 418.) Plaintiff complained of posterior upper leg pain

with internal right hip rotation, but exhibited a normal range of motion in his left hip. (R. at

418.) Dr. Faulkner opined that Plaintiff had a questionably positive right straight leg raise

evaluation, because, although Plaintiff stated that he was in pain, there was no physical

suggestion that Plaintiff was in pain. (R. at 418.)

Plaintiff walked from the waiting room to the evaluation room with a "slow, apparently

painful, gait." (R. at 418.) However, after his evaluation, Plaintiff walked briskly with a mild-

to-moderate limp, favoring his right leg and appeared to have normal balance. (R. at 418.)

Plaintiff could barely walk on his toes, limped, complained of right leg cramping and was only able to walk on his toes with "much drama and apparent difficulty." (R. at 418.) Plaintiff complained of posterior right leg pain while walking on his heels. (R. at 418.) Plaintiff could reach five inches below his inferior patellar poles during anterior waist flexion and Plaintiff demonstrated minimal effort. (R. at 418.) Despite complaining of pain, Plaintiff could perform a deep knee bend while holding onto the counter, stand up unassisted and move easily while bending over to tie his shoe. (R. at 419.)

Based on an x-ray taken, Dr. Faulkner diagnosed Plaintiff with mild lower degenerative disc and facet joint disease. (R. at 419, 423.) Based on Plaintiff's medical history, examination and other information, Dr. Faulkner concluded that Plaintiff was not "functionally disabled from working." (R. at 419.)

### 5. Crossover Health Center

On March 19, 2012, Plaintiff saw Daniel Jannuzzi, M.D. at Crossover Health Center in Richmond, Virginia. (R. at 499.) On March 26, 2012, Dr. Januzzi completed a disability determination, diagnosing Plaintiff with lower back pain and degenerative disc disease. (R. at 499.) Dr. Jannuzzi opined that Plaintiff's diagnosis rendered Plaintiff unable to work permanently and that Plaintiff should apply for disability. (R. at 499.)

### 6. Virginia Medical Exams

On July 9, 2012, Plaintiff saw Victoria Grady, M.D. of Virginia Medical Exams, Inc. in Herndon, Virginia, for a medical consultation. (R. at 502.) Plaintiff complained of back pain. (R. at 502.) Plaintiff told Dr. Grady that he "had to roll out" when he got up in the morning, that he sometimes needed help to get up, that his right leg buckled from time-to-time and that he had problems picking up the laundry basket. (R. at 502.) Plaintiff stated that he had "sharp pain[s]

10

and cramps," that his pain was in his lumbar and went down his leg to his right foot, that his pain was fifteen to twenty out of ten and that he could not do anything. (R. at 502.) Plaintiff said that "his doctor told him to stop taking the medicine he prescribed," and that while Plaintiff's doctor prescribed injections in Plaintiff's back, Plaintiff had not had epidural spinal injections. (R. at 502.)

Plaintiff claimed to have sciatic nerve damage that had been ongoing on his right side since 2007. (R. at 503.) Plaintiff told Dr. Grady that his pain "ha[d] him bent over," and that it hurt when he walked long distances, including during the fifty-foot walk to his mailbox. (R. at 503.) Plaintiff needed help at times putting on his socks and that he kept his shoelaces tied so that he could slip his feet into his shoes. (R. at 503.) Plaintiff claimed that he could not lift his five-year-old daughter, that he could not play with his daughter on the floor, that he could not do yard work, but that, when he did do yard work, he needed to take constant breaks. (R. at 503.)

Dr. Grady recorded that Plaintiff struggled to get up from the waiting room couch, but that Plaintiff was alert and oriented to date, location and person. (R. at 503.) Dr. Grady stated that Plaintiff's gait was antalgic, favoring Plaintiff's right lower extremity. (R. at 504.) Plaintiff could not "tandem," but briefly balanced on his heels and toes. (R. at 504.) Plaintiff could balance on his right foot and left foot, and Plaintiff's finger-to-nose was intact. (R. at 504.) Plaintiff had moderate difficulty completing the heel-to-shin test and he complained of pain, but Plaintiff was able to cross his ankles and "flex up halfway right and left leg." (R. at 504.)

Plaintiff scored 5/5 on his right and left hand grip strength tests, 5/5 on his right and left upper extremity muscle groups tests, 5/5 on his right and left hamstrings, iliopsoas, dorsiflexion and plantar flexions tests, and 4/5 on his left and right quadriceps and calf strength tests. (R. at 504.) Plaintiff was tender to palpitation over his lumbar spine, over his left and right hips, and

11

his right and left SI joints. (R. at 504.) Plaintiff did not use a device to ambulate during the evaluation and Plaintiff could remove his shoes and socks, though Plaintiff picked up his feet by grabbing his pant leg. (R. at 504.) Dr. Grady diagnosed Plaintiff with a herniated disc with lower back pain and a sciatic nerve on the right side causing pain. (R. at 505.)

Dr. Grady assessed that Plaintiff could occasionally lift and carry ten pounds. (R. at 507.) According to Dr. Grady, Plaintiff could sit for one hour without interruption, stand for one hour without interruption and walk for one hour without interruption. (R. at 508.) During an eight-hour work day, Plaintiff could sit for four hours, stand for four hours and walk for four hours. (R. at 508.) Plaintiff required a cane to ambulate, though Dr. Grady did not test how far Plaintiff could ambulate without a cane. (R. at 508.) Dr. Grady determined that Plaintiff could frequently reach, handle, feel, finger, push and pull things with both his right and left hands, and Plaintiff could occasionally operate foot controls with either foot. (R. at 509.) Plaintiff could occasionally climb stairs and ramps, climb ladders and scaffolds, balance, stoop, kneel, crouch and crawl. (R. at 510.)

Dr. Grady stated that Plaintiff could occasionally tolerate exposure to moving mechanical parts and operate a motor vehicle, but Plaintiff could never tolerate unprotected heights, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat or vibrations. (R. at 511.) Plaintiff could only tolerate moderate noise at work. (R. at 511.) Dr. Grady determined that Plaintiff could perform individual activities like shopping, travel without a companion for assistance, climb a few steps at a reasonable pace while using a single hand rail, prepare a simple meal, feed himself, care for personal hygiene and sort, handle and use papers and files. (R. at 512.) Plaintiff could not walk a block at a reasonable pace on rough or uneven

surfaces or use standard public transportation.  (R. at 512.)  Dr. Grady stated that Plaintiff's limitations lasted or would last for twelve consecutive months.  (R. at 512.)

C. Function Report

On February 17, 2011, Plaintiff completed a Function Report.  (R. at 246-53.)  Plaintiff lived in an apartment.  (R. at 246.)  When in pain, Plantiff's daily routine included waking up, taking a pill and then washing and getting dressed before starting his day.  (R. at 246.)  Plaintiff walked to his doctor's office and then eat.  (R. at 246.)  Plaintiff then returned home and rested, because his legs and back hurt from walking.  (R. at 246.)  Plaintiff took his medications and slept until he woke up due to cramping.  (R. at 246.)

Plaintiff reported leg cramping and shooting back pain when he put on his shoes, back pain when he sat to eat and lower back pain when using the toilet.  (R. at 247.)  Plaintiff required no special reminders to take care of personal needs, grooming or medication.  (R. at 248.)  Plaintiff prepared his own meals daily, including frozen dinners and sandwiches.  (R. at 248.)  Plaintiff wrote that it took him forty-five minutes to an hour to cook meals, because he needed to sit down between preparation of different parts of the meal.  (R. at 248.)

Plaintiff could wash dishes while sitting.  (R. at 248.)  Plaintiff went outside alone daily, travelled on foot, rode in a car or used public transportation.  (R. at 249.)  Plaintiff did not drive himself.  (R. at 249.)  When Plaintiff went shopping, he shopped for food.  (R. at 249.)  He could pay bills, handle a savings account, count change and use checkbooks or money orders, and those skills had not changed since the alleged onset of his disability.  (R. at 249.)

Plaintiff listed that his hobbies and interests as watching television, listening to and writing music, writing poetry and reading.  (R. at 250.)  Plaintiff stated that he engaged in his

hobbies daily and that he did them "very well." (R. at 250.)  Plaintiff checked that he spent time with others and that he had no issues getting along with family and friends. (R. at 250-51.)

Plaintiff's condition affected his ability to lift, walk, climb stairs, squat, sit, bend, kneel, stand, complete tasks, reach and concentrate. (R. at 251.)  Plaintiff wrote that he could walk four blocks before needing to rest an hour before resuming walking. (R. at 251.)  Plaintiff followed instructions "[t]o the letter," he had no problems with authority figures and he had never been fired from a job because of problems getting along with others. (R. at 251-52.)

Plaintiff reported that as a security guard, he "check[ed] trucks and equipment as they left the yard" and that he "[drove] around [the] yard to check doors on [buildings] after hours." (R. at 269.)  Plaintiff's job required him to use machines, tools or equipment, complete or write reports, but did not require technical knowledge or skills. (R. at 269.)  Plaintiff stated that his security job required him to, in total, walk for eight hours, stand for eight hours and sit for four hours. (R. at 269.)  As a security guard, he was required neither to lift more than ten pounds nor supervise others. (R. at 269.)

D.  Plaintiff's Testimony

On April 9, 2012, Plaintiff (assisted by a non-attorney representative) testified during a hearing before the ALJ. (R. at 28-50.)  Plaintiff was forty-two years old and lived with his mother. (R. at 33-34.)  Plaintiff had a four-year-old daughter who lived in Springfield, Missouri. (R. at 34, 46.)  Plaintiff completed school through the tenth grade and earned his GED. (R. at 35.)  Plaintiff received food stamps to financially survive. (R. at 35.)

Plaintiff was not working and had last worked in 2009 at a staffing center kitchen and at a recycling plant. (R. at 35-36.)  Plaintiff stated that the staffing company terminated him, because his condition prevented him from bending over and picking items off of a conveyor belt at the

14

recycling center. (R. at 36.) Before working for the staffing service, Plaintiff worked for six months building fireplaces and as a security guard. (R. at 37-38.) As a security guard, Plaintiff was not required to lift or carry any weight. (R. at 37.) Plaintiff's primary responsibilities as a security guard were to "check-in, check-out" a property. (R. at 37.)

Plaintiff testified that he was unable to work because of his back pain and sciatic nerve damage on the right side of his body. (R. at 38.) He explained that he could not sit for long periods of time, walk up and down stairs or walk long distances. (R. at 38.) Plaintiff's pain sometimes affected the left side of his body and sometimes caused his right leg to give out. (R. at 39.) Plaintiff stated that he could sit comfortably for no more than ten minutes and could only walk fifty feet before his leg began hurting. (R. at 40.) Plaintiff used a cane, but he did not have a doctor's prescription for the cane. (R. at 48.) Plaintiff testified that he could occasionally lift twenty pounds. (R. at 41, 48.) Plaintiff believed that he could routinely lift a gallon jug of milk. (R. at 48.)

Plaintiff testified that, on a nearly daily basis, he could not get out of bed because of back pain. (R. at 41.) The most that Plaintiff could do around the house was sweep the floor, but he had to take breaks and sit down to finish. (R. at 41.) Plaintiff attempted to do his own laundry, but ended up having to have his mother finish for him. (R. at 42.) Plaintiff could stand enough to make one or two sandwiches to eat, but had to sit down after. (R. at 42.) Plaintiff wrote poetry as a hobby and used to write music, but had stopped. (R. at 42.)

During the hearing, Plaintiff described his pain as being in his lower back and down his right leg. (R. at 43.) On a scale of one-to-ten, Plaintiff rated his pain as being "beyond a 10." (R. at 43.) Plaintiff blamed this pain on having to catch the bus to the hearing — specifically walking up and down the steps on the bus and walking across the street to the hearing building.

(R. at 43.)  Plaintiff assessed his pain level as typically being an eight on a scale of one-to-ten.

(R. at 44.)  Plaintiff was prescribed Naproxen and Liboderm for his pain.  (R. at 39.)  Other than

medication, Plaintiff stated that nothing helped alleviate his pain.  (R. at 45.)  After about two

hours of sleep, Plaintiff's leg cramps woke him up for the rest of the night.  (R. at 45.)  Plaintiff

could occasionally walk out the cramps.  (R. at 45.)  Plaintiff testified that he needed to sit down

in the tub to bathe.  (R. at 45.)  Plaintiff could dress himself by sitting in a low chair, but often

needed help from his mother to put on his shoes.  (R. at 45-46.)  Although he required the

assistance of a motorized cart, Plaintiff shopped for groceries.  (R. at 46.)

Plaintiff used to smoke marijuana, and testified that one of his doctors in Las Vegas "said

it was OK because it helped . . . relax the muscles in [his] body."  (R. at 47.)  Plaintiff stated that

he smoked marijuana every other day, but that he had not smoked marijuana in a month.  (R. at

47.)  Plaintiff testified that he smoked a pack of cigarettes a week, but that he was trying to quit.

(R. at 47.)

On January 8, 2013, Plaintiff (assisted by a non-attorney representative) testified during a

supplemental hearing in front of a different ALJ.  (R. at 62-79.)  Plaintiff testified that he

attempted to work after his alleged disability onset date of June 26, 2009, but was fired because

he could not bend over to pick things off of the conveyor belt at a recycling center.  (R. at 66.)

Plaintiff stated that the recycling center job lasted a week and a half.  (R. at 67.)

Plaintiff testified that his lower back pain prevented him from working.  (R. at 71.)

Plaintiff described his back pain as excruciating.  (R. at 71.)  On a scale of one-to-ten, Plaintiff

rated his back pain as an eight or nine and constant.  (R. at 71.)  Picking up his daughter or

excessively heavy items made Plaintiff's back pain worse.  (R. a 72.)  Sitting for about thirty

minutes caused Plaintiff's back to stiffen up, and Plaintiff had to lie down to stretch his body

completely before he could stand up. (R. at 72, 76.) Plaintiff stated that standing for long periods of time made his back hurt worse. (R. at 72-73, 76.) Plaintiff testified that he could walk a city block with help and could walk from the front of his house to the mailbox and back without assistance. (R. at 76.)

Plaintiff was using a cane and testified that he had used it since it was prescribed to him in 2012 after he fell in Dr. Jannuzzi's office. (R. at 73.) Plaintiff testified that the only thing that helped with his pain was sitting in a bath tub of very hot water. (R. at 74.) The only medication that Plaintiff claimed that he was on was ibuprofen, which helped reduce Plaintiff's pain a little. (R. at 75.) Plaintiff testified that Dr. Jannuzzi told him to stop taking all of his medications, except for the ibuprofen, because they were not working. (R. at 75.)

Plaintiff testified that his past work as a security guard involved minimal walking, because the property was too large. (R. at 77.) As a result, Plaintiff drove a cart around the grounds. (R. at 77.) Plaintiff testified that he did not stand for more than ten minutes between his rounds, and that estimation "include[ed] getting out, walking to check door knobs, and going to get back in the cart." (R. at 77.) Plaintiff worked eight-to-twelve hours a day as a security guard, and Plaintiff made his rounds every thirty minutes. (R. at 78.) Plaintiff testified that he worked for one security company for roughly eight months and for another for roughly two months. (R. at 78-79.)

E.  Vocational Expert Testimony

During both hearings, a VE testified that Plaintiff's work as a security guard qualified as semi-skilled work requiring light exertion and that Plaintiff's work constructing fireplaces was heavy work that required medium exertion. (R. at 51-52.) The VE testified that an individual who could perform light work with limited postural activities, including climbing ramps, stairs,

ladders, ropes or scaffolds, balancing, stooping, kneeling and crawling, could perform Plaintiff's past work as a security guard, even if the individual required an assistive device for walking. (R. at 52-55, 80-85.)

During the second hearing, the ALJ asked the VE if an individual that maintained the RFC to perform sedentary work with certain restrictions — including use of a cane — could perform Plaintiff's past work. (R. at 87.) The VE confirmed that the individual could return to Plaintiff's past work as a security guard, as indicated in the VE's answers to interrogatories. (R. at 87.) Further, the VE indicated that such a person could perform other jobs that existed in the national economy, specifically those that the VE indicated in the answers to interrogatories. (R. at 87.) These jobs included working as a charge account clerk, with 52,000 positions in the national economy and 700 in Virginia; addresser, with 60,000 positions in the national economy and 900 in Virginia; and, callout operator, with 90,000 positions in the national economy and 1,100 in Virginia. (R. at 84-85, 307.)

## II. PROCEDURAL HISTORY

On January 19, 2011, Plaintiff filed an application for DIB, claiming disability due to herniated discs, lower back pain and sciatic nerve damage with an alleged onset date of August 26, 2007. (R. at 189-91.) The claim was initially denied on March 31, 2011. (R. at 92-93.) Plaintiff filed a written request for a hearing on April 4, 2011, and the ALJ held a hearing on April 19, 2012. (R. at 28-58, 106-107.) On January 8, 2013, a different ALJ held a supplemental hearing following Plaintiff's amendment of his alleged onset date to June 29, 2009. (R. at 62-90, 205.) On January 16, 2013, the second ALJ issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff was not disabled under the Act, because Plaintiff could perform his past work and other work that existed in the national economy. (R. at 13-21.)

18

On May 27, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1.)

### III. QUESTIONS PRESENTED

1. Did the ALJ err in the weight afforded to Dr. Grady's opinion and to Dr. Januzzi's opinion?

2. Did the ALJ err in assessing Plaintiff's credibility?

3. Did the ALJ err in finding that Plaintiff could perform jobs existing in the national economy?

4. Did the ALJ err in determining that Plaintiff could perform his past work?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings

as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

20

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[1] based on an assessment of the claimant's RFC[2] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472.

---

[1]   Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[2]   RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## V. ANALYSIS

### A. The ALJ's Decision

On April 19, 2012, the ALJ held a hearing during which Plaintiff (assisted by a non-attorney representative) and a VE testified. (R. at 28-59.) A different ALJ held a supplemental hearing on January 8, 2013, during which Plaintiff (assisted by a non-attorney representative) and a VE testified. (R. at 62-90.) On January 16, 2013, the second ALJ rendered his decision in a written opinion and determined that Plaintiff was not disabled under the Act. (R. at 10-21.)

The ALJ followed the five-step sequential evaluation process as established by the Social Security Act in analyzing whether Plaintiff was disabled. (R. at 14-15.) At step one, the ALJ

determined that Plaintiff had not engaged in SGA from Plaintiff's amended onset date through Plaintiff's last insured date. (R. at 15.) At step two, the ALJ determined that Plaintiff suffered the severe impairments of degenerative disc disease of the lumbar spine and obesity. (R. at 16.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.)

The ALJ further found that Plaintiff maintained the RFC to perform sedentary work as defined by 20 C.F.R. §§ 404.1567(a) and 416.967(a), but with certain limitations. (R. at 16.) Plaintiff could occasionally lift or carry up to ten pounds and frequently lift or carry less than ten pounds. (R. at 16.) Plaintiff could sit, stand and walk up to four hours and needed to alternate between sitting and standing or walking every hour. (R. at 16.) Plaintiff required a cane for walking. (R. at 16.) Plaintiff could frequently handle, finger, feel, push/pull and reach in all directions. (R. at 16.) He could occasionally use foot controls, occasionally climb ramps, stairs, ladders and scaffolds, and occasionally balance, stoop, kneel, crouch and crawl. (R. at 16.) Plaintiff had to avoid all exposure to hazards, including unprotected heights, moving machinery and motor vehicle operation. (R. at 16.) Plaintiff also needed to avoid humidity or wetness, environmental irritants, vibrations and extreme heat or cold. (R. at 16.) Finally, Plaintiff could only work in a job where the noise level did not exceed moderate levels. (R. at 16.)

At step four, the ALJ found that Plaintiff could perform his past work as a security guard. (R. at 19.) Alternatively, at step five of the analysis, based upon VE testimony and answers to interrogatories and considering Plaintiff's age, education, work experience and RFC, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 20-21.) Therefore, Plaintiff was not disabled under the Act. (R. at 21.)

Plaintiff challenges the ALJ's decision, arguing that the ALJ erred in affording Dr. Grady's and Dr. Jannuzzi's opinions little weight, in assessing Plaintiff's credibility, in determining that Plaintiff could perform his past work and, alternatively, in determining that Plaintiff could perform jobs existing in the national economy. (Pl.'s Mem. at 17-23.)

B. The ALJ did not err in assessing the opinions of Dr. Grady and Dr. Jannuzzi.

Plaintiff argues that the ALJ erred in affording Dr. Grady's opinion and Dr. Januzzi's opinion very little weight. (Pl.'s Mem. at 17-18.) Defendant maintains that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 15) at 14-18.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 404.1527, 416.912(a)-(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-03p. Acceptable medical

sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. 20 C.F.R. §§ 404.1527(a), 416.913(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d).[3] Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these

---

[3]      The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a). The given examples are a non-exhaustive list.

enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

1. Dr. Grady's opinion

In this case, the ALJ gave no treating source controlling weight and had to reconcile opinions from several different sources, including Dr. Grady. Dr. Grady opined that Plaintiff could sit for four hours, stand for four hours and walk for four hours in an eight-hour work day, and that Plaintiff could sit for one hour without interruption, stand for one hour without interruption and walk for one hour without interruption. (R. at 508.) Dr. Grady stated that Plaintiff required the use of a cane to ambulate. (R. at 508.) According to Dr. Grady, Plaintiff could frequently reach, handle, feel, finger, push and pull things, and Plaintiff could occasionally operate foot controls, climb stairs and ramps, climb ladders and scaffolds, balance, stoop, kneel, crouch and crawl. (R. at 509-10.) Plaintiff could not tolerate unprotected heights, wetness and humidity, odors, dust, fumes and pulmonary irritants, extreme cold or heat or vibrations. (R. at 511.) Dr. Grady determined that Plaintiff could tolerate moderate noise at work. (R. at 511.) According to Dr. Grady, Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces or use standard public transportation. (R. at 512.) Ultimately, the ALJ did not completely reject Dr. Grady's opinion, but rather the ALJ afforded it very little weight, because the opinion was not supported by her own physical examination and was inconsistent with other evidence in the record. (R. at 19.) Substantial evidence supports the ALJ's decision.

Dr. Grady recorded that Plaintiff balanced on his right foot and his left foot during examination. (R. at 504.) Plaintiff scored 5/5 on his right and left hamstrings, iliopsoas, dorsiflexion and plantar flexions tests. (R. at 504.) Further, Plaintiff scored 4/5 on his left and right quadriceps and calf strength tests. (R. at 504.) Plaintiff could remove his shoes and socks

during the evaluation as well. (R. at 504.)  Although Plaintiff did not use a device to ambulate at

the evaluation and Dr. Grady assessed that Plaintiff required the use of a cane to ambulate, Dr.

Grady did not test how far Plaintiff could walk without the use of a cane. (R. at 508.)  Dr. Grady

believed that Plaintiff could not use standard public transportation, but Dr. Grady did not report

asking Plaintiff about his use of public transportation, nor did Dr. Grady test how far Plaintiff

could ambulate or on what surfaces. (R. at 512.)

Substantial evidence supports the ALJ's determination based on other medical evidence

in the record as well.  Nurse Gauthier noted that Plaintiff's back was normal to inspection. (R. at

369.)  In early 2008, Dr. Urban also noted that Plaintiff had no disturbance with his gait. (R. at

335.)  On February 6, 2009, Dr. Avena noted that Plaintiff had a normal gait and station. (R. at

349.)  In April 2009, an x-ray revealed that Plaintiff had normal C-spine and L-spine. (R. at

330.)  Nurse Winchell reported that Plaintiff had good range of motion in his upper extremities

and head and neck. (R. at 341.)  Further, Plaintiff successfully completed external rotation

testing without significant pain and had no atrophying in his lower extremities. (R. at 341-42.)

On May 12, 2009, the physical therapist recorded that Plaintiff's hip flexion, knee flexion, knee

extension and dorsiflexion were all 5/5 bilaterally. (R. at 382.)  On May 27, 2009, Dr. Avena

reviewed an x-ray and noted that it showed no new degenerative changes. (R. at 384.)

On June 25, 2010, Dr. Schmitt examined Plaintiff and found that Plaintiff's neck and

back were negative for injury. (R. at 404-05.)  Further, except for a finger deformity, Plaintiff's

musculoskeletal and extremity exam yielded normal results. (R. at 404-05.)  On July 8, 2010,

Dr. Gilbreth opined that Plaintiff moved about easily with a steady and deep gait. (R. at 400.)

Plaintiff moved all four limbs and maintained 5/5 strength in all extremities. (R. at 400.)  At the

Kitchen Clinic that summer, Plaintiff was able to toe and heel walk. (R. at 485.)  On February

27

23, 2011, Dr. Faulkner observed that Plaintiff sat and moved comfortably in the waiting room before his visit. (R. at 417.)  Additionally, Plaintiff propped himself up on his elbows during the visit to work on crossword puzzles. (R. at 417.)  Dr. Faulkner noted that Plaintiff exhibited full range of motion in his left hip, and during Plaintiff's straight leg raise, also noted that no physical suggestion existed showing that Plaintiff was in pain.  (R. at 418.)  On July 9, 2012, Dr. Grady noted that Plaintiff could balance on his heels and toes, his right foot and his left foot. (R. at 504.)  Plaintiff further scored a 5/5 on his hand strength grip tests bilaterally, upper extremity muscle groups tests bilaterally, and his hamstrings, iliopsoas, dorsiflexion and plantar flexion tests bilaterally. (R. at 504.)  Additionally, Plaintiff scored a 4/5 on his quadriceps and calf strength tests bilaterally. (R. at 504.)

Finally, substantial evidence supports the ALJ's decision on the basis of Plaintiff's own statements.  Plaintiff reported that he would walk to his doctor's appointments and then go out to eat. (R. at 246.)  On a daily basis, Plaintiff went outside, traveled on foot and used public transportation. (R. at 249.)  Plaintiff could go grocery shopping. (R. at 249.)  Plaintiff reported that he could walk four blocks before needing to stop and rest. (R. at 251.)  Plaintiff testified that he could occasionally lift twenty pounds and that he routinely could lift a gallon of milk. (R. at 41, 48.)  Additionally, Plaintiff could do house chores such as sweeping. (R. at 41.)

Therefore, substantial evidence supports the ALJ's opinion to afford Dr. Grady's opinion very little weight.

### 2. Dr. Jannuzzi's opinion

In this case, the ALJ gave no treating source controlling weight and had to reconcile opinions from several different sources, including Dr. Jannuzzi.  Based on the record, Dr. Jannuzzi saw Plaintiff on March 19, 2012. (R. at 498.)  On March 26, 2012, without examining

Plaintiff again, Dr. Jannuzzi completed a Virginia Department of Social Services Medical Report for General Relief, Medicaid and Temporary Assistance for Needy Families. (R. at 499.) Based on the single visit on March 19, 2012, Dr. Jannuzzi diagnosed Plaintiff with lower back pain and degenerative disc disease. (R. at 499.) Based on this diagnosis, Dr. Jannuzzi concluded that Plaintiff was permanently unable to work and that Plaintiff should apply for disability. (R. at 499.) The ALJ did not reject Dr. Jannuzzi's opinion in its entirety, but rather assigned Dr. Jannuzzi's opinion very limited weight, because Dr. Jannuzzi only saw Plaintiff once before concluding that Plaintiff was disabled, and Dr. Jannuzzi formed his opinion "without the support of appropriate diagnostic/clinical findings." (R. at 19.)

In this case, the ALJ appropriately discounted Dr. Januzzi's opinion, because Dr. Januzzi based his opinion on a single examination. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (noting that frequency of examination and extent of treatment relationship constitute factors for evaluation of medical opinions); *see also* SSR 06-03p (discussing weighing of opinions and appropriateness of affording more relative weight to certain opinions than to others based on length of treatment). Further, although Dr. Januzzi opined that Plaintiff was totally disabled and should apply for disability, the decision as to whether Plaintiff was totally disabled rests with the Commissioner. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d). Accordingly, the ALJ did not err in his treatment of Dr. Januzzi's opinion.

Contrary to Plaintiff's assertion that the ALJ should have given Dr. Januzzi's opinion that Plaintiff was permanently disabled great weight because medical records corroborated Dr. Januzzi's opinion, (Pl.'s Mem. at 18.), medical records do not fully corroborate Dr. Januzzi's opinion. Nurse Gauthier noted that Plaintiff's back appeared normal to inspection and a spasm on the right of Plaintiff's spine no longer existed. (R. at 369.) Later in 2007, Dr. Avena opined

that Plaintiff maintained a normal gait, easily moving from his chair to the examination table. (R. at 371.) In February 2008, Dr. Avena opined that Plaintiff was ambulatory and again had no trouble moving around and getting on the examination table. (R. at 375.)

On February 6, 2009, Dr. Avena again noted that Plaintiff maintained normal gait and station. (R. at 349.) A spring 2009 x-ray revealed that Plaintiff had normal C-spine and L-spine. (R. at 330.) Nurse Winchell recorded that Plaintiff had good range of motion in his legs bilaterally. (R. at 341.) Plaintiff also completed external rotation testing without significant pain. (R. at 341.) In May 2009, Plaintiff's physical therapist noted that Plaintiff scored 5/5 bilaterally on his hip flexion, knee flexion, knee extension and dorsiflexion. (R. at 382.) Later that month, Dr. Avena opined that x-rays taken since Plaintiff's last appointment revealed no significant degenerative changes. (R. at 384.)

On June 25, 2010, Dr. Schmitt examined Plaintiff's neck and back, and noted that both were negative for injury and pain. (R. at 404-05.) Except for a finger deformity suffered as a result of attempting to break up a fight, Plaintiff's musculoskeletal and extremity examination returned normal results. (R. at 404-05.) On July 2010, Dr. Gilbreth noted that Plaintiff walked with a deep and steady gait. (R. at 400.) Additionally, Plaintiff maintained 5/5 strength bilaterally in all extremities and moved all four limbs. (R. at 400.) Plaintiff's musculoskeletal and extremities exam was negative for injury. (R. at 400.)

On February 23, 2011, Dr. Faulkner observed that Plaintiff sat and moved comfortably in the waiting room before his appointment. (R. at 417.) During the appointment, Dr. Faulkner noted that Plaintiff propped himself on his elbows lying on his stomach to work on crossword puzzles. (R. at 417.) Dr. Faulkner opined that Plaintiff was overly dramatic and that there was

30

no physical suggestion that Plaintiff was in pain during his right straight leg raise test. (R. at 418.) Plaintiff further exhibited normal range of motion in his left hip. (R. at 418.)

On July 9, 2012, Dr. Grady noted that Plaintiff could balance on his heels and toes. (R. at 504.) Plaintiff did not use a device to ambulate and could remove his shoes and socks during the appointment. (R. at 504.) Plaintiff scored 5/5 on his right and left hand grip strength tests, right and left upper extremity muscle groups test, and his hamstrings, iliopsoas, dorsiflexion and plantar flexions tests. (R. at 504.)

Therefore, the ALJ did not err in his treatment of Dr. Januzzi's opinion.

C.   The ALJ did not err in assessing Plaintiff's credibility.

Next, Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility, because the record demonstrated that Plaintiff suffered from degenerative disc disease and lower back pain and that Plaintiff consistently sought treatment for that pain. (Pl.'s Mem. at 19-20.)[4] Defendant maintains that substantial evidence supports the ALJ's credibility determination. (Def.'s Mem. at 18-20.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a), 416.929(a). The first step is to determine whether there is an underlying

---

[4]   Plaintiff also alleges that the ALJ mistook the Kitchen Clinic, where Plaintiff walked for medical treatment, for a restaurant, and that the function report never stated that Plaintiff went out to eat. (Pl.'s Mem. at 19-20.) Plaintiff's function report, however, indicates that Plaintiff would walk to his doctor's office, go eat and then return home to rest. (R. at 246.)

medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms.  SSR 96-7p at 1-3.  In doing so, the ALJ must consider all of the medical evidence in the record.  *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5, n.3; *see also* SSR 96-8p at 13 ("The RFC assessment must be based on all of the relevant medical evidence in the record . . . .").  If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work.  *Craig*, 76 F.3d at 595.  The ALJ's evaluation must take into account "all the available evidence," including a credibility determination of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements.  *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations.  *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997).  The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'"  *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)).  Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'"  *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled.  *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994).  Instead,

32

"subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements regarding the intensity, persistence and limiting effects were not credible for the reasons detailed in the opinion. (R. at 18.) The ALJ went on to discuss how medical records conflicted with Plaintiff's statements. (R. at 18.)[5]

Substantial evidence supports the ALJ's decision on the basis of medical records. In 2007, Nurse Gauthier recorded that Plaintiff's back appeared normal and previous spasms no longer were present. (R. at 369.) In early 2008, Dr. Urban opined that Plaintiff had no disturbance in his gait. (R. at 335.) During a February 2009 appointment, Dr. Avena noted that Plaintiff had a normal gait and station. (R. at 349.) On April 1, 2009, Dr. McCourt observed that Plaintiff had no difficulty walking. (R. at 329.) Additionally, in reviewing an x-ray of Plaintiff's spine, Dr. McCourt reported that Plaintiff had a normal C-spine and L-spine. (R. at 330.) On April 10, 2009, Nurse Winchell observed that Plaintiff had good range of motion in his upper extremities, head and neck. (R. at 341.) Nurse Winchell also noted that Plaintiff completed external rotation testing without significant pain and that Plaintiff had no atrophy in his lower extremities. (R. at 341-42.) On May 12, 2009, physical therapist Almaz Araya observed that Plaintiff had 5/5 hip flexion, knee extension and dorsiflexion bilaterally. (R. at

---

[5]     Although the ALJ's stated rationale for diminishing Plaintiff's credibility was for reasons detailed in the opinion, by subsequently discussing Plaintiff's medical records in conflict with Plaintiff's allegations, the ALJ made clear his explanation for diminishing Plaintiff's credibility involved conflict with medical records. *See Mascio v. Colvin*, 780 F.3d 632, 640 (4th Cir. 2015) (discussing error by the ALJ in diminishing Plaintiff's credibility without explanation).

382.) On May 27, 2009, Dr. Avena reviewed x-rays that showed no significant degenerative changes. (R. at 384.)

On June 25, 2010, Dr. Schmitt opined that Plaintiff's neck and back were negative for injury and pain. (R. at 404-05.) Further, Dr. Schmitt's musculoskeletal and extremity examination yielded normal results, except for a finger deformity that occurred while Plaintiff attempted to break up a fight. (R. at 404-05.) On July 8, 2010, Dr. Gilbreth observed Plaintiff moving around easily and with a deep and steady gait. (R. at 400.) Dr. Gilbreth additionally noted that Plaintiff moved all four limbs and that he maintained 5/5 strength in all extremities. (R. at 400.) Plaintiff's musculoskeletal and extremities exam returned negative results for injury or deformity. (R. at 400.) In the summer of 2010, Plaintiff could toe and heel walk at the Kitchen Clinic. (R. at 485.)

In February 2011, Dr. Faulkner noted that Plaintiff reported that he had the ability to walk four blocks. (R. at 417.) Dr. Faulkner also observed Plaintiff sitting and moving comfortably in the waiting room before the appointment. (R. at 417.) Further, Plaintiff propped himself up on his elbows and did crossword puzzles during the appointment. (R. at 417.) Dr. Faulkner found that Plaintiff had normal range of motion in his left hip and opined that although Plaintiff stated that he was in pain during the right straight leg raise, no physical suggestion existed indicating that Plaintiff was in pain. (R. at 417.)

On July 9, 2012, Dr. Grady observed that Plaintiff balanced on his heels and toes and could balance on both his right and left feet. (R. at 504.) Dr. Grady found that Plaintiff scored a 5/5 on his right and left hand grip strength tests, right and left upper extremity muscle groups tests and his right and left hamstrings, iliopsoas, dorsiflexion and plantar flexions tests. (R. at

34

504.) Finally, Dr. Grady found that Plaintiff scored a 4/5 on his left and right quadriceps and calf strength tests. (R. at 504.)

     Therefore, substantial evidence supports the ALJ's credibility determination.

     D. The ALJ did not err in determining that Plaintiff could perform work existing in the national economy.

     Plaintiff argues that the ALJ erred in determining that Plaintiff could perform other work available in the national economy. (Pl.'s Mem. at 22-23.) In challenging the ALJ's step five analysis, Plaintiff assumes a correct formulation of Plaintiff's RFC, but argues that no employer in a competitive work environment would allow accommodations consistent with Plaintiff's RFC. (Pl.'s Mem. at 22-23.) Defendant responds that substantial evidence supports the ALJ's decision at step five. (Def.'s Mem. at 21-22.)

     At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner can carry her burden in the final step with the testimony of a VE. As noted earlier, when a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker*, 889 F.2d at 50. Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

     In this case, the ALJ determined that Plaintiff maintained the RFC to perform sedentary work with certain limitations. (R. at 16.) Plaintiff could occasionally lift or carry up to ten pounds and frequently lift or carry less than ten pounds. (R. at 16.) Plaintiff could sit, stand and

walk up to four hours and needed to alternate between sitting and standing or walking every hour. (R. at 16.) Plaintiff required a cane for walking. (R. at 16.) Plaintiff could frequently handle, finger, feel, push/pull and reach in all directions. (R. at 16.) He could occasionally use foot controls, occasionally climb ramps, stairs, ladders and scaffolds, and occasionally balance, stoop, kneel, crouch and crawl. (R. at 16.) Plaintiff needed to avoid all exposure to hazards, including unprotected heights, moving machinery and motor vehicle operation. (R. at 16.) And, Plaintiff had to avoid humidity or wetness, environmental irritants, vibrations and extreme heat or cold. (R. at 16.) Finally, Plaintiff could only work in a job where the noise level did not exceed moderate levels. (R. at 16.)

During the second hearing, the VE confirmed to the ALJ that the VE's answers to interrogatories were accurate and that, given Plaintiff's RFC, jobs existed in the national economy that Plaintiff could perform. (R. at 88, 305-06.) Given Plaintiff's RFC, including the limitation that Plaintiff needed to use an assistive device to walk, the VE determined that Plaintiff could perform the jobs of call out operator, charge account clerk or addresser. (R. at 88, 306-07.)

In this case, the ALJ's hypothetical posed to the VE was appropriate, because it properly accounted for Plaintiff's RFC — which Plaintiff does not challenge at this step. Relying on the VE's testimony and answers to interrogatories, the ALJ determined that, considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform work existing in significant numbers in the national economy. Because the hypothetical posed to the VE took into account all of Plaintiff's limitations described in the RFC and because the ALJ properly relied on the VE's testimony and answers to interrogatories, the ALJ did not err in determining that jobs existed in the national economy that Plaintiff could perform.

E. Any error in determining that Plaintiff could perform his past relevant work as a security guard was harmless.

Plaintiff argues that the ALJ erred in determining that Plaintiff could perform his past work as a security guard. (Pl.'s Mem. at 20-21.)  Specifically, Plaintiff argues that because Plaintiff's RFC required him to avoid operating a motor vehicle and exposure to hazards, Plaintiff could not drive the motorized cart used in his past security work. (Pl.'s Mem. at 21.) Defendant argues that substantial evidence supports the ALJ's determination, because Plaintiff operated a cart, not a motor vehicle, and because Plaintiff could otherwise perform the job as security guard with his limitations. (Def.'s Mem. at 20-21.)

At step four of the sequential analysis, the ALJ must assess the claimant's RFC and past relevant work to determine if the claimant can perform the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If such work can be performed, then benefits will not be awarded. 20 C.F.R. §§ 404.1520(e), 416.920(e).  If a claimant, however, cannot perform his past relevant work, the ALJ must determine whether considering the claimant's age, education, work experience and RFC, the claimant can perform other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers*, 207 F.3d at 436 (citing *Yuckert*, 482 U.S. at 146, n.5.).  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and, accordingly, entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

In this case, the ALJ determined that Plaintiff could return to his past work as a security guard, which included the use of a cart. (R. at 19.)  The ALJ stated that Plaintiff's past security work required him to sit for prolonged periods of time with roughly ten minutes of standing each hour since Plaintiff was given a cart to drive. (R. at 19.)  The ALJ held that Plaintiff's RFC

aligned with the physical and mental skills required to actually perform Plaintiff's past work as a security guard. (R. at 19.)

The Court need not address Defendant's argument that a cart fails to qualify as a motor vehicle. Even assuming that the ALJ did err in concluding that Plaintiff could return to his past work as a security guard, the Court finds that such error was harmless.

Resolution of this issue must begin with a discussion of the application of the harmless error rule in a Social Security Disability case. In *Shineski v. Sanders*, a case involving review of the denial of veterans' claims for disability benefits, the Supreme Court held that the harmless error rule applies in both the civil and administrative contexts. 556 U.S. 396, 407 (2009). Although the Fourth Circuit has yet to address the application of *Sanders* to Social Security Disability cases in a published opinion, the Court in two unpublished opinions has applied the harmless error doctrine when reviewing Social Security appeals. *See Garner v. Astrue*, 436 F. App'x 224, 225 n.* (4th Cir. 2011) (unpublished) (finding that a drafting error constitutes harmless error); *Morgan v. Barnhart*, 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished) (finding error by the ALJ regarding time restrictions for sitting and standing to be harmless).[6] Consequently, this Court believes that the harmless error rule set forth in *Sanders* applies to Social Security Disability appeals; indeed, this Court has repeatedly applied the harmless error rule in past Social Security appeals. *Parrish v. Colvin*, 2014 WL 412558, at *11 (E.D.Va. Feb. 3, 2014); *Maitland v. Colvin*, 2013 WL 3788246, at *12 (E.D.Va. July 18, 2013); *Phelps v. Astrue*, 2012 WL 6803711, at *9 (E.D.Va. Dec. 10, 2012); *Nelson v. Astrue*, 2012 WL 3555409, at *8-9 (E.D.Va. July 31, 2012).

---

[6]     Although not directly addressing harmless error, the Fourth Circuit's recent published decision in *Mascio v. Colvin* discussed the potential for an ALJ's error to be harmless. *See* 780 at 639 ("The ALJ's error would be harmless if he properly analyzed credibility elsewhere. But here, the ALJ did not.").

Having determined that the harmless error rule applies, the question then becomes whether the error here was harmless. The burden establishing that the error was harmful rests on "the party attacking the agency's determination." *Sanders*, 556 U.S. at 409. As the Court in *Sanders* elaborated:

> To say that the claimant has the "burden" of showing that an error was harmful is not to impose a complex system of "burden shifting" rules or a particularly onerous requirement . . . . Often the circumstances of the case will make clear to the appellate judge that the ruling, if erroneous, was harmful and nothing further need be said. But, if not, then the party seeking reversal normally must explain why the erroneous ruling caused harm.

*Id.* at 410. Thus, when reviewing a decision for harmless error, a court, among other things, must look at:

> An estimation of the likelihood that the result would have been different, an awareness of what body . . . . has the authority to reach that result, a consideration of the error's likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings, and a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference.

*Id.* at 411-12. And "where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether consideration is necessary." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2010).

Here, any error at step four by the ALJ would constitute harmless error, because the result would not have been different. As required under the regulations, had the ALJ determined that Plaintiff could not return to his past work as a security guard, the ALJ had to move to step five to determine whether Plaintiff could perform jobs existing in the national economy. As noted above, substantial evidence supports the ALJ's decision at step five. Accordingly, even if

the ALJ erred in determining that Plaintiff could return to his past work as a security guard, such error was harmless given the ALJ's finding at step five.

## VI.  CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED, that Plaintiff's Motion for Remand (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  May 20, 2015